Our next case is Assa Abloy AB v. CPC Patent Technologies Ltd. Docket number 25-1078. Counselor Lavigneur, you have reserved three minutes of your time. You can use up all your time too if you want. Thank you, Your Honor. May it please the Court, Lionel Lavigneur from Finnegan for Appellant. So today we have an appeal from the Patent Office, Board of Patent and Trademark Appeals, and we're looking at the term biometric signal. This is a term that was looked at two times before by the Board. Both times we believe the Board got it wrong. And the reason that we believe that the word biometric signal was interpreted wrong by the Board is it does not give meaning to the single embodiment in the patent. That embodiment has two processes that are described, an authentication process, which does use a fingerprint, which is biometric, and then an enrollment process, which uses another type of input to the biometric sensor, a tap, which is not traditionally considered biometric. Does it pick up its fingerprint at that point? It does not. The patent specification does not describe in any way that during the tap the fingerprint is picked up. CPC argued to the Board that the fingerprint could be picked up. The Board said no. The Board did not agree with that. And we know that the fingerprint is not used for sure because in the patent, when the enrollment process is described, it is compared against a ROM memory that has these tap instructions, these legal instructions as either ones or zeros, which the patent calls bits or dials, like Morse code. And that ROM does not have a fingerprint in it. But when you're in the, that's for enrollment. When you're in the authentication phase, you do have a fingerprint. So there's two distinct memories that are described in the patent. One memory is for the fingerprints, which is around volatile memory, which can be changed, you can update, you can put and remove the fingerprints. That is biometric, yes, of course. I understand your theory of what's being disclosed here at columns 10 to 11, but I don't see anywhere in that passage that suggests that the fingerprint sensor is being turned off for fingerprint reading purposes. That's exactly right. And that there's nothing more that's being received by the system than the physical taps. You're exactly right, Your Honor, is that there is nothing that says that the finger, that the biometric sensor is not being used because it's the same biometric sensor. So the biometric sensor, there's just one biometric sensor that's disclosed. And that's why our construction for the biometric signal is that the biometric signal, which is described in the patent as either for enrollment or authorization, that signal has to give meaning to both. I guess my question is why would the biometric sensor disclosed in the patent choose to look away and not accept the fingerprint readings or deny itself the fingerprint reading function that it's designed to do for purposes of enrollment? For purposes of enrollment, we're not saying that the biometric sensor is looking away. What we're saying is that the only disclosure is that there is a tap which is not disclosed as a fingerprint being accessed during the enrollment process. It says finger presses, right, not taps. There's a finger press, which is one second or two seconds, and then the pressing is also described as, I'm thinking of Matthiasson, which is also a tap, that's correct. So it's a press, but it's not shown that that press, because remember the comparison of the biometric signal is not a fingerprint. The comparison of the biometric signal in the enrollment process is against the one or the zero, the dot, dot, dot, dash. So there's no need or there's no showing, there's no disclosure in the specification for that. And then I guess there's that one provision in column 11 near the top which talks about how if the presses aren't done within the proper duration for enrollment purposes, then those presses will be interpreted by the system merely to be the presses intended to provide access to the controlled item. I'm at column 11, lines 10 to 12 roughly. And that to me sounds pretty clear that at least from the system's point of view they're trying to interpret what these current finger presses are. And they could be enrollment finger presses or they could be authentication finger presses. But if they're interpreted to be authentication finger presses, then obviously those are fingerprint readings. And it seems like it stands to reason it's likewise fingerprint readings in the context of enrollment as well. But consider the words, Your Honor, that you just read, which is that in the event that a legitimate sequence of finger presses are not delivered within the predetermined time, then the presses are considered not to be control information. So now we're no longer in the enrollment phase. And if it's not in the enrollment phase, then we're no longer comparing to the ROM. And if we're no longer comparing to the ROM, we go from finger press to fingerprint. And then also the words are not the use of authentication or enrollment. The words are presses intended to provide access. So once we're outside of enrollment, then to the extent that the presses are intended to provide access, which we don't know exactly what that means, but we do know that the only disclosure of presses is against the ROM for the tabs and not using fingerprints. And then also in addition to that, once you're in the enrollment process, remember that you've already authenticated. So you've already put your fingerprint into the system. So that is already there. That happened once, conceivably, right? That's correct, Your Honor. And then also, Judge Tinn, one other thing that you mentioned is, well, you know, isn't it possible or could it be that during the enrollment process that there is possibly a fingerprint being taken? And we'll note that there's a lot of evidence actually from CPC's expert that he notes that it's illogical, if not impossible, to read fingerprints while providing finger commands during enrollment. And there's record evidence, there's a 1505 from the appendix, where the expert says, fingerprint scanning involves passing one's entire fingerprint over the sensor in a way to make sure the entire fingerprint is imaged. And so he goes into much more detail on how the ridges and structures of the fingerprint must actually be pressed in a way that's other than a press. It must be completely put onto the sensor. And he notes, for example, that there's also one second is a decent enough time to read a fingerprint, is it not? One second, it depends on the computational issue. Another citation from CPC's expert is, quote, taking sufficiently precise reading of a fingerprint to be able to authenticate its unique identification is much more computationally intensive than the mere sensing of a fingerprint. So he's noting that just pressing and taking a fingerprint are much more different, not only in the time it takes, but also in the computational requirements of the system. So all of these are indicators that a press is completely distinct. And then also if you look at the fact that the board, in the Mathiasson reference, it was the same tapping, the dit-dit-da. It was exactly the same. So the only reason that the board said, well, we're not going to allow Mathiasson to be used, is because they said we're using this claim construction that's going to require a physical or behavioral attribute, basically a fingerprint. We're requiring a fingerprint. And so we said, well, we think that requiring a fingerprint is improper because the patent itself does not say that that fingerprint is required. CPC's expert has said that it would be very difficult to do that with a single tap. And for that reason, it would not be appropriate to limit the construction. And that's why our claim construction is input-output to the biometric sensor. Can I ask a question about that? Yes, Your Honor. You've got input and output of the biometric sensor. But I'm having a bit of trouble with that because the claim limitation, for example, in claim one, is a biometric sensor configured to receive a biometric signal. So how can it be the output of the biometric sensor? If the biometric sensor is going to receive a biometric signal and then later there's a reference to the series of entries of the biometric signal, how can it be the input? We're trying to capture both the input and the output. How can it be the output? I understand you're trying to capture both. I hope you understand what I'm saying. I'm wondering if your construction is inconsistent with the plain claim one. We think that our construction, I mean, basically, is as close as the board's construction but more correct because we don't exclude an embodiment. I understand. How do you respond to it? I'm going to try to make my question a little more clear. How can the biometric signal, which is received by the biometric sensor, so it must be the input, actually be the output? How can I interpret that to be the output based on the claim? Why isn't the biometric sensor, even under your view, why isn't the biometric signal, whatever it is, just the input to the sensor? If the coordinate de novo review just limited us to input, we would be perfectly fine with that because it would still be consistent with the claim and it would still work for the mapping. We were just trying to include both input and output because the biometric sensor receives the fingerprint and then puts that into the RAM or compares it against the RAM database and then the biometric sensor, once it receives it, it has to send it to the RAM to check. So it's that use of the biometric sensor for taking fingerprint in and then processing it internally within the system. That's what we were trying to capture with that construction. And so with that, Your Honor, I think that we have covered most of the points I had with respect to the biometric signal, which is the single embodiment. Just real quickly, you cited A1505, the other side's expert, right? Yes. About how quick finger movements can't possibly be fingerprint readings. But the expert there was describing Matthiasen's embodiment and Matthiasen's cursor control mode. And that's different than the one-second versus two-second fingerprint presses of the patent specification. In other words, the expert wasn't commenting on the relative difficulty, if any, of the fingerprint presses described in columns 10 to 11. The expert was describing Matthiasen's embodiment. At 1505, Your Honor, that is correct. But on 1504, for example, he is specifically referring to the patent itself where he says, It was known in the art at the time of the 705 patent, fingerprint scanning required wiping one's finger down over the sensor so as capturing the ridges and valleys of the entire fingerprint. So that's 1504, referring specifically to the patent. And then on 1505, when he went into describing Matthiasen, he was just continuing on with the same point, which is that it is more difficult to scan a fingerprint than it would be to just tap and that the input of the biometric sensor would distinguish between those. So with that, Your Honor, I think that I've covered most of the points with respect to the biometric signal. There's a sole embodiment. There's two processes. The board's construction is too narrow because it does not allow, in our view, the enrollment process to be considered for the point I've noted. We have one other point on the appeal, and that is the Bianco reference. The Bianco reference, we'll note that there's two patents. There's three IPRs. And in each one of those arguments, when we mapped the prior art against the claims, we started with Bianco. It was our primary reference. And then whenever we wanted to supplement it in our obviousness argument, we supplemented it with Matthiasen. But in every single element, there's elements A, B, C, D, and E, five elements to the claim, we always started with Bianco. And, in fact, for the key elements, elements D, 1, D, 2, and D, 3, relating to the enrollment procedure, we also started with Bianco. And yet, despite the fact that we argued Bianco throughout our petition, the board did not rule on Bianco. And so we believe that that is another error that is in the board's decision that should be corrected on remand. The other side, CPC, they note that the Netflix case and other cases would say the opposite. But in the Netflix case and the other cases that they cite, you don't have the situation where the party actually argued the reference in every single element. There's either a distinction where no argument was made or an unclear argument was made. And, in fact, CPC even acknowledges that we made the argument for each of the references. Not for limitation D, 2, though. For D, 2. They don't admit to anything like that. And if you look at the discussion of 1059 to 1061, particularly the final paragraph of limitation D, 2 in the petition, it's quite clearly a Matthiasen-only, Matthiasen-centric theme for how limitation D, 2 is met. And then if you look at the final paragraph from the petition for limitation D, 1, it's all about Matthiasen again. But, Your Honor, I understand what you're saying. But even at 1059 through 1061, when we're talking about the arguments for D, 2, we have a whole page talking about what we believe Bianco discloses. Then after that, we supplement that with Matthiasen. So we are making the Bianco argument. It's just that we supplement it with Matthiasen, but we don't only argue Matthiasen. Okay. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. There is, in fact, no disclosure in the CPC patents of utilizing non-biometric entries to send biometric signals. Appellants go to significant lengths to sort of contort the disclosure of the patents to try to arrive at some alleged suggestion or disclosure within the CPC patents that that is what's happening, including for what they refer to as the enrollment limitation. But, in fact, there is no disclosure, and the patents are clear we submit. Are you saying that none of the enrollment process is captured by the claim, by the patent? No. I'm sorry, Your Honor. No, I'm not saying that. What we're saying is even when to be clear, if we go to the series of entries limitations, the D limitations that are fundamentally at issue here, it is true that those can be used to enroll a user. They are used actually to populate the database, which also includes other functionality besides just enrollment. If you look, for example, there is duress attributes that can be populated, but you can also erase a user. So erasing is also part of populating the database. So it's not just enrollment, even though that's what they refer to it as. The bigger picture point, though, Your Honors, is that the suggestion that what is being used to issue what they call control signals in the patent, which might be an enrollment signal, could be a duress signal, the suggestion that what is being used to issue those control signals are TAPs, is simply not supported in the patents. As Your Honor, Judge Chen, I think, recognized, the word TAPs does not appear anywhere in the CPC patents. That's something that's been used only by appellants in this case. I think the best place to start to confirm all of this, first and foremost, is the claim language. And if you look at Claim 1, which is that Appendix 229, and the structure of Claim 1, you see that biometric signal is used three times. The first place it's introduced is in connection with there being a sensor that is configured to receive a biometric signal. Next, it's talked about in connection with that biometric signal, rather a controller configured to match the biometric signal against members of the database of biometric signatures to thereby output an accessibility attribute, i.e., the claim requires the implementation of a biometric signal like a fingerprint that can then be matched to a database of signatures, a database full of other fingerprints that have already been enrolled. And there is no evidence in the record anywhere that a TAP can be matched against the database. So the biometric signal must be something that can be matched against the database. The Board found this below, and that's not contested here on appeal. The Board at Appendix 70 expressly found that the biometric signal is a signal that can be received by a biometric sensor and also can be matched to a database. A TAP cannot be matched to a database. Continuing on in the claim, we get to what's at issue here, what I refer to as either the D1 through 3 limitations or the series of entry limitations, which talks about receiving a series of entries of the biometric signal and then doing the code with it. It's the biometric signal that was used earlier in the claim for authentication. This is sort of, frankly, basic claim construction rules, right? The same term in a claim is given its same meaning. Do you agree that the biometric signal, as you've just discussed, is the entry to the biometric sensor, whatever the input is? Absolutely. The biometric signal is input onto a sensor. So in the context of a fingerprint, the fingerprint is placed into a sensor. You have to put your, I mean, I probably all had occasion to have our fingerprints taken at some point in our lives at this point. I mean, you push your thumb down on a sensor and it measures it and it takes your fingerprint. And, you know, it could be a second, it could be two, but it takes your fingerprint. That's what's happening here. And that's also what's happening in the series of entries. Because the claim itself is telling us that it must be, because it is the biometric signal that was also used to match to the database. If the biometric signal is a tap. Is the fingerprint captured during the dot process? You're saying it is. It is a fingerprint. And for that, we can go to some language that, Judge Chen, you already brought up, which is column 11, lines 8 through 12 of the patent. And in our view, it could not be more clear that the series of entries must be a fingerprint series of entry and not some mere tap. And that portion. You couldn't use your nose. Exactly. To do the tapping. Of course not. Of course not. And nor could you use the tip of a fingernail, as opposed to an actual fingerprint press. And we know this for exactly the reasons Judge Chen cited earlier. Because it tells us that if you get the code wrong, if the sequence of presses isn't input in the right number or the right time, then those presses are considered not to be control information, and merely to be presses intended to provide access. And I believe appellant's counsel might have said, you know, we don't know how access is granted. We know exactly how access is granted. There's one and only one way that access to the system is granted. And that is that the sensor intakes a biometric signal like a fingerprint that can then be matched against a database of the fingerprints of authorized users so that it can tell, okay, this is an authorized person. I'm going to let them in. The system cannot grant access based on taps. And so the proposed construction and the idea that the loan embodiment, the dit-dit-dit-dot embodiment doesn't include fingerprints, would make no sense in the context of this patent. Do you agree that claim one needs to encompass this enrollment process described in columns 10 through 11? That if claim one were construed to exclude whatever has been discussed here, that would be a problem. Yes. I think it should encompass what's disclosed. That is an enrollment embodiment that is disclosed. It's encompassed by claim one, but it is encompassed because, in fact. This is a technical matter, thinking about what you need in order for enrollment after the administrator has already been authenticated into the system. Why would it be technically required to have a series of fingerprint readings be used for enrollment purposes? It seems like it could be nothing more than just taps. So I'm glad you asked that. I want to address that because that seems to be a significant part of their argument. And you framed the question. Why would you, after being authenticated once, re-enter fingerprints? I think there's two answers that I'd like to give to that question. The first is I think the question itself sort of misses the mark. It's an argument about convenience or redundancy. It's maybe unnecessary to have a second set of fingerprints. But convenience or redundancy, I mean, maybe appellants wouldn't design the system that way. Maybe even this court wouldn't design the system this way. That doesn't mean the inventor didn't design the system this way. The clear teaching of both the claim language itself, the specification, including column 11, line 8 through 12, is that those entries are fingerprints. Secondarily, though, in fact, it is entirely consistent with this invention that those entries be full fingerprints during the dit-dit-dit-da. Appellants agree the only person who can enter control signals and roll a user is the administrator. In order for the system to know for sure that the person entering the dit-dit-dit-das is the right, authorized, lawful administrator, it takes fingerprints even while that dit-dit-da is being entered. The patent is very clear. Because otherwise what could happen is administrator approaches system, puts in thumbprint. Now imagine the scenario where bad guy comes up from behind, clocks are over the head, and then bad guy taps in and enrolls a bunch of other bad people into the system. Sounds absurd, right? Except the patent literally talks about it. If you look at column 11, lines 45 to 55, the patent talks about the duress scenario and literally talks about the user being in a coercive situation where, for example, an armed criminal is forcing the user to access the secure facility. So notwithstanding that that maybe sounds a little unlikely, it's a security patent. I mean, this is about security. It's about trying to button up any possible weakness that you could find in the system. And it is a biometric security system. So to the extent that maybe it seems a little unnecessary after the administrator has already authenticated him or herself to do it also while putting in the fingerprints, it also is safer. It's more secure because that way even when the commands are being issued, the series of entries, if you're saying, sure, it could have been done through a particular pattern of finger taps, but for whatever reason this inventor chose to use biometric signals as a means for creating the pattern needed for the enrollment process. That's exactly right, Your Honor. And I also want to note, and I think you got to this earlier yourself, Judge Chen, the only sensor disclosed in the CPC patents is a biometric sensor or in particular in the embodiment a fingerprint sensor. There is no disclosure, there's no evidence, there's no expert that says that the sensor, the fingerprint sensor of the CPC patents is capable of doing anything with a bunch of taps. It's a fingerprint sensor. It can sense a fingerprint. But where does the patent say that that sensor is also capable of receiving a series of taps, interpreting and processing and analyzing those taps? Fingerprint sensors don't inherently do that. And, for example, there is no disclosure, unlike in Mathiasen, which clearly had multiple modes for the same sensor, there's no disclosure of that here. In the CPC patents it doesn't say in one mode the sensor can take in a fingerprint for authentication, in another mode it can interpret taps. So, respectfully, there's just no basis to find that that's what the sensor is doing here. And clearly the reason this is being argued is to try to read the CPC patents backwards onto the Mathiasen prior art. I'll talk briefly about some comments that were made during Appellant's argument. The testimony from CPC's own expert that was referred to, again, Judge Chen, it was talking about Mathiasen. You know, the discussion of, you know, why you wouldn't necessarily want to take a full fingerprint reading when you're also issuing commands, was a discussion of Mathiasen. And, in part, too, the purpose of that testimony was to explain why it wouldn't have been obvious, the person wouldn't have been motivated to come up with the design of the CPC patents, which is actually using full fingerprints, including as part of the series of entries. I will also note, Your Honors, the argument that there's different, that the controller 107 is what evaluates the accuracy of the series of entries, relative to the user ID database 105 that evaluates the matching of the fingerprints, that's all fine. You can have different parts of the system doing different things. But what the patent teaches very clearly is that when a biometric signal is entered, it is checked, or at least capable of being checked, against the user ID database for matching. So, for example, if Your Honors look at Figure 3, it shows very clearly, thumbprint gets entered, then it gets matched against database of biometric signatures. Specification talks about this. For example, this is at Appendix 225, Column 5, Lines 12 through 9. Once the biometric signal is received, it is compared against the biometric signature database. There is nothing inherent in the discussion of enrollment, which is a discussion of enrollment, that means that these things aren't also happening. So, in other words, when you put the series of entries of your fingerprint in, to issue, for example, a enroll new user command, that certainly doesn't mean that the steps of Figure 3 aren't also happening. There's nothing in the patent that says when you input your fingerprint, it gets matched against the database of biometric signatures, except for when we're doing enrollment. Like, that doesn't appear anywhere in the patent. It's a description of enrollment that talks about enrollment, but it doesn't mean that it excludes other things that are actually happening within the system. Have some of the patent claims already been knocked out? Yes, Your Honor. In the prior, there was, I apologize, I think I'm out of time, but there was a proceeding brought by Apple, an IPR proceeding brought by Apple, and this court issued a decision invalidating certain claims of the CPC patents. And in particular, this court previously, in that Apple IPR, found claims 1, 4, 6, 10 through 12, 14 through 16, and 17 of the 705 patent to be invalid, and claims 1, 3 through 7, 9 through 11, and 13 of the 208 to be invalid. And for the sake of being comprehensive, that means that there are multiple surviving claims. Claims 2, 3, 5, 7, 8, 9, and 13 of the 705 are still valid. Claims 2, 8, and 12 of the 208 are still valid. I would just simply note that Apple IPR involved different parties, different prior art, different arguments, different outcome. Okay. We have your argument. Thank you. Thank you, Your Honor. Stated plainly, Your Honors, the input for the enrollment cannot be a fingerprint at all. Zero. We know this because when we look at what is compared, it is in ROM. The ROM cannot have fingerprints. If you are an administrator and you're accessing this system, you can only put in two things, and this is from the specification at column 11, lines 56 through 58, which is there's a description of number of presses or duration of presses. So it has to be not a fingerprint. A fingerprint is not a number of presses. A fingerprint is not a duration. And the fingerprints are in a separate database. If you're going in to be an administrator and change something, then you're going in with you have to know it is dot, dot, dot, dash. You have to know that. That's the secret code. There is no way that the enrollment can be a fingerprint. So everything that you heard from opposing counsel cannot be true. It is a stored, this is from the patent, a stored set of legal control signals stored in ROM that cannot be a fingerprint. And that's really all we have. Does it have to be a finger that does the tapping? It does not. It has to be something that the fingerprint sensor can recognize as a tap. It can be your nose, Your Honor. So the pen, yeah, the pen would permit a stick or a pencil, pencil tapping. It would, anything that the biometric sensor can recognize. I'm not sure if the tip of a pencil would be picked up, but your nose certainly would be. And if you wanted to tap it one second, one second, one second, two seconds, then that would be compared to the legal control signals in the ROM, which are not fingerprints. And that would allow you to access the system. You could not do that with a fingerprint because the fingerprint does not have a number of presses or a duration of presses associated with it. Only the pressing. Okay. Thank you. Thank you. We thank the parties for their argument.